IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ANNIE BOONE,                          )
                                      )
                    Plaintiff,        )
                                      )
        v.                            )        1:17CV113
                                      )
                                      )
BOARD OF GOVERNORS OF THE             )
UNIVERSITY OF NORTH CAROLINA,         )
                                      )
                    Defendant.        )

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

        Plaintiff, Annie Boone, initiated this action against Defendant, the Board of Governors

of the University of North Carolina ("UNC"), alleging four claims: (1) failure to accommodate

under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*; (2)

failure to accommodate under the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*; (3) retaliation

under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; and, as an

alternative to her first and second claims, (4) interference under the FMLA, 29 U.S.C. § 2601

*et seq.* (ECF No. 1.) On March 30, 2018, this Court entered a Memorandum Opinion and

Order ("2018 Order") dismissing Plaintiff's first and fourth claims, leaving only Plaintiff's

Rehabilitation Act claim and Plaintiff's FMLA retaliation claim. (ECF No. 15 at 16.) Before

the Court are Defendant's Motion for Summary Judgment with respect to the two remaining

claims, (ECF No. 33), and Defendant's Motion to Seal, (ECF No. 35). For the reasons

outlined below, the Court will grant both motions.

## I. BACKGROUND

Plaintiff applied for a position as a police officer at UNC in March 2012 and started working shortly thereafter. (*See* ECF No. 40-1.) Her job duties included patrolling UNC's Chapel Hill campus, responding to service calls, investigating criminal activity, making arrests, and training other officers in the field. (ECF No. 34-1 at 18–21.) She also carried a variety of weapons as part of her job, including a 40-caliber SIG SAUER pistol, a taser, a shotgun, and a rifle. (*Id.* at 19–20.)

In May 2015, Boone spent a weekend in South Carolina with a male friend. (*Id.* at 44–45.) Plaintiff states that, during that weekend, the man raped her. (*Id.*) Although Plaintiff received treatment in an emergency room a day later, (*id.* at 47–48), she did not report the rape to law enforcement or to her primary physician because she "just wanted to deal with it in [her] way and move on," (*id.* at 50–51).

In August 2015, Plaintiff attended a Highway Safety Symposium in Concord, North Carolina with several co-workers from UNC. (*Id.* at 56–57.) One night during the multi-day conference, Plaintiff became very intoxicated and missed the morning session the following day. (*Id.* at 59, 61.) The day after she returned from the conference, Plaintiff confided in a co-worker that she "was having some concerns about [her] ability to do [her] job with the mindset that [she] was in." (*Id.* at 63.) Approximately one week later, on August 28, 2015, Plaintiff was placed on a 30-day Investigatory Status with Pay to investigate Plaintiff's absence from the symposium and "[t]o allow time to receive [a] Fitness for Duty assessment." (*Id.* at 68; ECF No. 34-2 at 41.)

Plaintiff was directed to complete a Fitness for Duty Evaluation ("FFDE") with the FMRT Group ("FMRT") on September 1, 2015. (ECF No. 34-2 at 42.) FMRT evaluators are doctoral-level psychologists and advanced-practice medical providers who are trained in providing "medical and psychological evaluations for safety-sensitive employers, such as law enforcement, corrections, and juvenile justice departments." (ECF No. 34-11 ¶ 4(a).) During Plaintiff's September 1, 2015 FFDE, after she told the psychologist administering the exam about her May 2015 sexual assault, the evaluation determined that she was "not fit for duty" due to her being "in the beginning stages of dealing with a traumatic event that has left her emotionally distraught." (*Id.* at 42–44.)

Plaintiff remained on leave and on October 16, 2015, saw her healthcare provider, Karen McCain, N.P.[1] (ECF No. 34-1 at 74.) At that visit, Nurse McCain recorded that Plaintiff was experiencing "[m]oderate depression" along with "crying episodes, extreme fatigue and [loss of] energy and was socially withdrawn." (ECF No. 34-5 at 14–15.) Plaintiff had lost ten to fifteen pounds, and her hair was thinning. (*Id.* at 17.) Plaintiff did not tell Nurse McCain about her sexual assault during that appointment, nor at any time before this litigation. (ECF No. 34-1 at 78; *see* ECF No. 34-5 at 16, 24.) As a result of the appointment, Nurse McCain recommended that Plaintiff seek "specialized" and "intensive" therapy, in addition to telephonic counseling sessions every two weeks with Nurse McCain. (ECF No. 34-5 at 18, 20.) Nurse McCain also completed the necessary forms for Plaintiff to be awarded FMLA leave retroactively starting September 28, 2015, when her paid investigative leave ended, to December 18, 2015. (*See* ECF No. 34-2 at 48.)

---

[1] Nurse McCain practiced under the supervision of Dr. Steven Prakken, M.D. (ECF No. 34-5 at 3.)

Plaintiff was granted some additional unpaid leave, and on January 6, 2016, she was again seen by Nurse McCain. (*Id.* at 54; ECF No. 34-7 ¶ 26.) As a result of that appointment, Nurse McCain found that Plaintiff "ha[d] recovered back to baseline, and [was] acceptable to return to work without any physical limitations or restrictions." (ECF No. 34-2 at 54.)

Before she could return to work, however, UNC asked that Plaintiff sit for another FFDE. (ECF No. 34-7 ¶ 27.) Plaintiff's January 8, 2016 follow-up FFDE found that she was again "not fit for duty." (ECF No. 34-11 at 48–50.) During the FFDE, Plaintiff reflected that her sexual assault makes her "feel[ ] guarded, avoid[ ] situations that make her feel vulnerable, and that she now has 'a hole in [her] armor.'" (*Id.* at 49.) Boone reported that, since her first FFDE in September, she had only seen her healthcare provider, Nurse McCain, twice and that she had not otherwise received any psychotherapy from a licensed practitioner.[2] (*Id.* at 48–49; *see also* ECF No. 34-5 at 22–23.) In arriving at her conclusion that Plaintiff was "not fit for duty," the evaluating psychologist determined, after witnessing Plaintiff's continuing distress during the evaluation, that Plaintiff had not accessed the appropriate degree of treatment. (ECF No. 34-11 at 49–50.) Further, the evaluating psychologist "strongly encouraged" Plaintiff to "initiate treatment with a licensed mental health professional with expertise in treating trauma." (*Id.* at 50.) As a result of her being found to be not fit for duty, Plaintiff was not allowed to return to work. (ECF No. 34-7 ¶¶ 28, 30.)

---

[2] Plaintiff had sought counseling from a Cindy Lassiter, a "care pastor" who provides "faith-based support and guidance," approximately "five or six times" in the period from October 2015 to December 2015. (ECF No. 34-4 ¶ 4; ECF No. 34-1 at 25.) Ms. Lassiter's "typical practice was to guide [her parishioners] to scripture teaching the healing power of prayer." (ECF No. 34-4 ¶ 5.) Ms. Lassiter states that she has never held herself out to be a licensed psychologist or counselor. (*Id.* ¶ 3.)

On January 28, 2016, Plaintiff submitted forms entitled "Voluntary Self-Identification of Disability," "Health Care Provider—Medical Information Release Form," and "Accommodation Request Form" to UNC. (ECF No. 40-9.) As part of her request for an accommodation, Plaintiff was required to submit a "Documentation of Disability" form, signed by an authorized healthcare provider, that includes "a description of [her] disability[,] any related limitations[,] and recommendations for accommodation(s) and/or service(s)." (*Id.* at 7.) Plaintiff did not submit such documentation; instead, she asked that the psychologist who conducted Plaintiff's second FFDE complete the form, "as [that doctor] was the only one saying [Plaintiff] was not fit to return to duty." (ECF No. 40-10.) After Plaintiff told UNC that her healthcare provider would not be completing the "Documentation of Disability" form, UNC terminated Plaintiff's employment, effective March 4, 2016. (ECF No. 40-11 at 2.)

## II.    MOTION TO SEAL

Defendant filed four documents under seal along with its Motion to Seal. (*See* ECF Nos. 37-1 to 37-4.) Those sealed documents include Plaintiff's medical records from various doctor visits and Plaintiff's "medical history statement" given when she applied to UNC in March 2012. (*See id.*) Both Defendant and Plaintiff filed briefs supporting the Motion to Seal. (ECF Nos. 36, 38.)

"When presented with a request to seal judicial records or documents, a district court must comply with certain substantive and procedural requirements." *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 576 (4th Cir. 2004). Substantively, a district court must "first 'determine the source of the right of access with respect to each document.'" *Doe v. Pub.*

*Citizen*, 749 F.3d 246, 266 (4th Cir. 2014) (quoting *Va. Dep't of State Police*, 386 F.3d at 576). The Fourth Circuit has "squarely held that the First Amendment right of access attaches to materials filed in connection with a summary judgment motion." *Id.* at 267. Therefore, the First Amendment right of access applies in this case, as the documents that Defendant wishes to seal were filed in support of, or in opposition to, Defendant's summary judgment motion.

> Procedurally, a district court presented with a sealing request must:

> > (1) provide public notice of the sealing request and a reasonable opportunity for the public to voice objections to the motion; (2) consider less drastic alternatives to closure; and (3) if it determines that full access is not necessary, it must state its reasons—with specific findings—supporting closure and its rejections of less drastic alternatives.

*Id.* at 272. Local Rule 5.4 outlines similar requirements.[3] LR 5.4. The burden rests on the party seeking to keep information sealed. *Va. Dep't of State Police*, 386 F.3d at 575.

First, the Court notes that the motion to seal has been publicly docketed since its date of filing on February 11, 2019. (ECF No. 35.) "Any interested party therefore has had sufficient time to seek intervention to contest any sealing order, but the docket reflects no such action." *Cochran v. Volvo Grp. N. Am., LLC*, 931 F. Supp. 2d 725, 728 (M.D.N.C. 2013). Accordingly, the Court concludes that the "public notice" requirement has been satisfied. *See id.* (concluding that a motion to seal docketed less than one month before the entry of the order to seal provided sufficient public notice).

---

[3] These requirements are: (1) stating "the reasons why sealing is necessary"; (2) explaining "why less drastic alternatives to sealing will not afford adequate protection"; (3) "[a]ddress[ing] the factors governing sealing of documents reflected in governing case law"; and (4) stating "whether permanent sealing is sought and, if not, stat[ing] how long the document should remain under seal and how the document should be handled upon unsealing." LR 5.4(b).

Next, Defendant and Plaintiff have demonstrated a sufficiently compelling interest in preserving the confidentiality of some of Plaintiff's sensitive medical information. "If the request is narrowly tailored, sensitive medical information may be sealed." *Bell v. Shinseki*, No. 1:12CV57, 2013 WL 3157569, at *9 (M.D.N.C. June 20, 2013), *aff'd*, 584 F. App'x 42 (4th Cir. 2014). The motion to seal is narrowly tailored to only include Plaintiff's medical records which summarize Plaintiff's medical visits or medication or treatment history. (*See* ECF Nos. 37-1 to 37-4.) The parties have filed, unsealed, other relevant medical records and information, such as Plaintiff's FFDE reports and excerpts of Plaintiff's and Nurse McCain's depositions. (*See* ECF Nos. 40-6, 40-8, 34-1, 34-5.) Further, because simply redacting portions of Plaintiff's medical records would be insufficient to protect the confidentiality of these materials, the Court finds it appropriate for the entirety of these documents to be filed under seal. *See Bell*, 2013 WL 3157569, at *9.

Because Plaintiff's interests in preserving the confidentiality of the documents in question overcome the First Amendment presumption of public access to court documents, Defendant's motion to seal will be granted.

## III.  SUMMARY JUDGMENT

### A.  Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party, and "[a] fact is material if it might affect the outcome" of the litigation. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (internal

quotation marks omitted).  The role of the court is not "to weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  When reviewing a motion for summary judgment, the court must view the evidence and "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the nonmoving party.  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

In cases where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) (emphasis omitted)).  In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).  The nonmoving party must support its assertions by citing to particular parts of the record, or by showing that the materials cited do not establish the absence of a genuine dispute. Fed. R. Civ. P. 56(c)(1); *see Celotex*, 477 U.S. at 324.  The judicial inquiry on summary judgment "thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

Plaintiff has two remaining claims pending against Defendant: a violation of the Rehabilitation Act for a failure to accommodate, and a violation of the FMLA for retaliation. (*See* ECF No. 34 at 2.)  Both counts will be addressed in turn.

## B. Rehabilitation Act

### 1. Statute of Limitations

Defendant first argues that Plaintiff's Rehabilitation Act claim is barred by the statute of limitations.  Plaintiff filed this action on February 9, 2017, (ECF No. 1), approximately eleven months after she was terminated on March 4, 2016, (ECF No. 40-11).  Defendant argues that the six-month limitations period from North Carolina's Persons with Disabilities Protection Act ("PDPA") should apply, (ECF No. 34 at 16–17), while Plaintiff argues for either the four-year limitations period from the Civil Justice Reform Act ("CJRA") or a two-year limitations period from a different section of the PDPA, (ECF No. 40 at 11–14).

"The Rehabilitation Act, like many civil rights statutes, does not contain a specific limitations period." *McCullough v. Branch Banking & Tr. Co.*, 35 F.3d 127, 129 (4th Cir. 1994). "When Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so." *Wilson v. Garcia*, 471 U.S. 261, 266–67 (1985*), partially superseded by statute as stated in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 377–80 (2004); *see also A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011) ("We therefore borrow the state statute of limitations that applies to the most analogous state-law claim.").  In *McCullough v. BB&T*, the Fourth Circuit held that the statute of limitations in the PDPA applies to Rehabilitation Act claims brought in North Carolina.  35 F.3d at 132.

In 1990, however, Congress enacted the CJRA, Pub. L. No. 101-650, 104 Stat. 5089, which created a catch-all statute of limitations of four years for any "civil action arising under an Act of Congress enacted after [December 1, 1990]," *id.* § 313, 104 Stat. at 5115 (codified as amended at 28 U.S.C. § 1658). Included in the CJRA's catch-all statute of limitations are federal causes of action that existed before December 1, 1990, but were amended after December 1, 1990, "if the plaintiff's claim against the defendant was made possible by a post–1990 enactment." *Jones*, 541 U.S. at 382–83.

In this case, the Rehabilitation Act was enacted on September 26, 1973. Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat. 355. Congress amended the Rehabilitation Act on September 25, 2008, when it enacted the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, which revised the definition of "disability" for the Rehabilitation Act, *see id.* § 4, 122 Stat. at 3555; *id.* § 7, 122 Stat. at 3558. Therefore, under the Supreme Court's decision in *Jones v. R.R. Donnelley & Sons Co.*, the statute of limitations that applies to Plaintiff's Rehabilitation Act claim turns on whether her claim was "made possible" by the ADAAA's revised definition of disability. *See Jones*, 541 U.S. at 382–83; *see also Dickinson v. Univ. of N.C.*, 91 F. Supp. 3d 755, 763–66 (M.D.N.C. 2015) (concluding that the CJRA's four-year limitations period applies because the plaintiff would not have been considered disabled without the ADAAA's revisions).

The parties do not dispute that Plaintiff was disabled under the ADAAA. (*See* ECF No. 34 at 17–23; ECF No. 40 at 15.) Defendant argues, however, that the CJRA statute of limitations does not apply because Plaintiff would have been considered "disabled" under the old definition of "disabled," before the ADAAA. (ECF No. 42 at 6–7.) Plaintiff argues in

response that she would not have been considered "disabled" before the ADAAA and that her claim was "made possible" by the ADAAA's revisions. (ECF No. 40 at 13–14.)

The Rehabilitation Act and ADA, before the ADAAA's revisions, had a "demanding standard for qualifying as disabled." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002), *abrogated by statute*, Pub. L. 110-325, 122 Stat. 3553. The pre-ADAAA definition of "disability" was "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A) (2007); 29 U.S.C. § 705(20) (2007) (stating that the Rehabilitation Act uses the same definition of "disability" as the ADA). To determine whether an impairment was "substantially limiting," courts would consider "the 'nature and severity of the impairment,' the 'duration or expected duration of the impairment,' and the 'permanent or long term impact' of the impairment." *Pollard v. High's of Balt., Inc.*, 281 F.3d 462, 467–68 (4th Cir. 2002) (quoting 29 C.F.R. § 1630.2(j)(2)). Courts routinely found that impairments that were not "permanent or long term" did not qualify as disabilities. *See, e.g.*, *Toyota Motor Mfg.*, 534 U.S. at 198 ("The impairment's impact must also be permanent or long term."); *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 199 (4th Cir. 1997) ("[I]t is evident that the term 'disability' does not include temporary medical conditions, . . . even if those conditions require extended leaves of absence from work." (internal citation omitted)), *overruled on other grounds*, *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 469 n.8 (4th Cir. 1999); *Peeples v. Coastal Office Prods., Inc.*, 203 F. Supp. 2d 432, 458 n.16 (D. Md. 2002) ("[E]ven assuming that [the plaintiff's] depression was a major or clinical depression, nevertheless, it clearly was a temporary condition, and his condition was thought to be temporary at all relevant times. Accordingly, [the plaintiff's] depression does not qualify as a 'disability.'"

(emphasis omitted)), *aff'd*, 64 F. App'x 860 (4th Cir. 2003). Although there was a "presumption" that temporary impairments did not qualify as disabilities under the ADA, "temporary conditions still require[d] a case-by-case evaluation . . . [because] at some point the duration of an impairment could be so long that it cannot properly be characterized as temporary." *Pollard*, 281 F.3d at 468–69 (internal citation omitted).

In the present case, Plaintiff was first granted leave on August 28, 2015, and was later cleared by her healthcare provider, Nurse McCain, to return to work on January 6, 2016. (ECF No. 34-2 at 41, 54.) When Nurse McCain saw Plaintiff in October 2015, Nurse McCain noted that Plaintiff's depressive symptoms had worsened so that Plaintiff was having trouble with "getting out of bed and . . . day-to-day grooming and hygiene." (ECF No. 34-5 at 14–15.) Nurse McCain also noted that Plaintiff had lost ten to fifteen pounds and that Plaintiff experienced "thinning hair . . . and some nausea." (*Id.* at 17.) When Nurse McCain saw Plaintiff on January 6, 2016, however, less than three months later, she concluded that Plaintiff had "recovered back to baseline" and that she could return to work. (ECF No. 34-2 at 54.)

Although Defendant argues that Plaintiff was "nearly catatonic for months," (ECF No. 42 at 6), Plaintiff's major symptoms were only a temporary condition. Plaintiff's major symptoms appear to have only lasted approximately four and one-half months, from August 28, 2015 until January 6, 2016. (*See* ECF No. 34-2 at 41, 54.) Four and one-half months is not long enough to be considered "permanent or long-term" under the pre-ADAAA framework. *See Pollard*, 281 F.3d at 469 (holding that the plaintiff's nine-month absence as a result of a back injury was not a "permanent or long-term impairment," and, thus, not a

disability).[4]  After January 2016, Plaintiff had apparently "returned back to baseline."  (ECF No. 34-2 at 54.)

Because Plaintiff would have not been considered "disabled" under the pre-ADAAA definition of "disability," her present claim has been "made possible" by the ADAAA's revised definition of "disability."  *See Jones*, 541 U.S. at 382–83.  Plaintiff is therefore entitled to the four-year statute of limitations in the CJRA.  *See id.*  Accordingly, because Plaintiff filed her complaint in the present case approximately eleven months after she was terminated, (*see* ECF Nos. 1, 40-11), her Rehabilitation Act claim is not barred by the statute of limitations.

## 2. Discussion

The Court will next examine the merits of Plaintiff's failure to accommodate claim under the Rehabilitation Act.  "Disability discrimination may be proven through direct and indirect evidence or through the *McDonnell Douglas*[5] burden-shifting framework."  *Jacobs*, 780 F.3d at 572 (footnote added).  Plaintiff does not appear to point to any direct or indirect evidence of discrimination in her brief, instead opting to address the factors of her prima facie case.  (ECF No. 40 at 15.)  Therefore, the Court will address Plaintiff's claim under the *McDonnell Douglas* framework.

---

[4] Further, to the extent that Defendant argues that Plaintiff was substantially limited in the major life activity of working, Plaintiff found another job at UPS approximately nine months after she was terminated by Defendant.  (*See* ECF No. 40-2 at 7.)  At the time of Plaintiff's deposition, she had worked at UPS for over two years and had been promoted twice.  (*Id.* at 7–10.)  This shows that, under the pre-ADAAA definition of disability, Plaintiff was not substantially limited in the major life activity of "working," *see Pollard*, 281 F.3d at 471 ("In order to be substantially limited in the major life activity of working, 'one must be precluded from more than one type of job, a specialized job, or a particular job of choice.'  . . . An individual must demonstrate that she is unable to work in a broad range of jobs." (quoting *Sutton v. United Air Lines*, 527 U.S. 471, 491–92 (1999))).

[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* burden-shifting framework, the plaintiff has the initial burden of proving, by a preponderance of the evidence, a prima facie case of discrimination. *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995). If the plaintiff succeeds, "the burden shifts to the defendant to articulate some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* Should the defendant satisfy its burden of production, the plaintiff has the final burden to persuade the factfinder that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Employment discrimination claims for failure to accommodate brought under the Rehabilitation Act are evaluated using the same standards as those applied under Title I of the ADA. *Reyazuddin v. Montgomery Cty.*, 789 F.3d 407, 413 (4th Cir. 2015). To establish a prima facie case for a failure to accommodate claim, a plaintiff must show "(1) that [s]he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of [her] disability; (3) that with reasonable accommodation [s]he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (second, fifth, and sixth alterations in original) (quoting *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)). The burden of establishing a prima facie case of discrimination based on disability is "not onerous." *Ennis*, 53 F.3d at 59 (quoting *Burdine*, 450 U.S. at 253).

Defendant argues that Plaintiff cannot show the final two factors of the prima facie case. (ECF No. 34 at 18–23.) Specifically, Defendant argues that "Plaintiff refused to engage

in the interactive process" to identify a reasonable accommodation and that "Plaintiff cannot show that any reasonable accommodation would have allowed her to perform the essential functions of her job." (*Id.* at 18, 21.) Plaintiff argues in response that Defendant was at fault for the breakdown in the interactive process to identify a reasonable accommodation and that Plaintiff had identified two reasonable accommodations that would have allowed her to return to work. (ECF No. 40 at 15, 17.)

       *a.  Breakdown in the Interactive Process*

"The duty to engage in an interactive process to identify a reasonable accommodation is generally triggered when an employee communicates to [her] employer [her] disability and [her] desire for an accommodation for that disability." *Wilson*, 717 F.3d at 346–47. "This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). For the interactive process to be effective, it requires "bilateral cooperation, open communication, and good faith." *Allen v. City of Raleigh*, 140 F. Supp. 3d 470, 483 (E.D.N.C. 2015). As the Fourth Circuit has noted:

> [N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 323 (4th Cir. 2011) (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135–36 (7th Cir. 1996)).

"During the interactive process, an employer may request and require that the employee provide sufficient medical documentation." *Allen*, 140 F. Supp. 3d at 485 (internal quotation marks omitted). An employer may ask for documentation that "(1) describes the nature, severity, and duration of the employee's impairment, the activity or activities that the impairment limits, and the extent to which the impairment limits the employee's ability to perform the activity or activities; and, (2) substantiates why the requested reasonable accommodation is needed." U.S. Equal Emp't Opportunity Comm'n, EEOC Notice No. 915.002, Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act (ADA), 2000 WL 33407181, at *10 (July 27, 2000) [hereinafter "EEOC Guidance"].

In this case, Plaintiff learned on January 22, 2016, that her second FFDE found that she was "not fit for duty." (ECF No. 34-7 ¶ 30; ECF No. 34-2 at 52.) In a phone conversation that day with Chief Jeffrey McCracken, Chief McCracken suggested that Plaintiff "contact [the Office of Human Resources] to discuss her available options, including short-term disability or a work accommodation under the [ADA]." (ECF No. 34-7 ¶ 30.) Pursuant to Defendant's instructions, Plaintiff completed and sent to Defendant on January 28, 2016, forms entitled "Voluntary Self-Identification of Disability," "Health Care Provider—Medical Information Release Form," and "Accommodation Request Form." (ECF No. 40-9.) When she submitted those forms, she wrote that she would "have the medical form returned to you as soon as the doctor makes available after the appointment on Tuesday." (*Id.* at 1.) Plaintiff never submitted her medical documentation of disability. (ECF No. 34-1 at 85.) Instead, Plaintiff requested that Dr. Sara Marcus, the FMRT psychologist who conducted her second FFDE, complete

her documentation of disability "[b]ecause she is the one who said [Plaintiff] was not fit to return to work and claimed that [Plaintiff] needed further . . . treatment." (*Id.*) Following Plaintiff's refusal to provide documentation of her disability from her healthcare provider, Defendant terminated Plaintiff effective March 4, 2016. (ECF No. 40-11 at 2.)

Defendant was entitled to request that Plaintiff provide additional medical documentation of her disability, beyond the FFDE report and her physician's note that purported to allow her to return to work. *See Allen*, 140 F. Supp. 3d at 485; EEOC Guidance, at *10. The FFDE process "is limited to whether the employee is fit for duty as of the date of evaluation," and "does not . . . endeavor to precisely predict when and under what conditions the employee might be fit for full duty." (ECF No. 34-11 ¶ 5(d).) Further, the FFDE process does not create a "doctor-patient" relationship, and the forms that Plaintiff signed before both FFDE's acknowledged that fact. (*Id.* at 41, 47.) Because of its limited scope, Plaintiff's FFDE report did not contain information regarding the "nature, severity, and duration of the employee's impairment." EEOC Guidance at *10. Therefore, Defendant was entitled to request that Plaintiff provide such additional information to ascertain whether a reasonable accommodation would allow Plaintiff to return to work. *See id.*

Plaintiff appears to conflate being found "not fit for duty" with a determination that she is disabled, under the ADA and Rehabilitation Act. (*See* ECF No. 40 at 17.) While there may be some overlap in these considerations, they are not the same. A FFDE focuses on the narrow question of whether the employee is fit for duty for the specific job in question. (ECF No. 34-11 ¶ 5(h); *see id.* ¶ 7.) In contrast, an employee is considered "disabled" if she is "substantially limit[ed] [in] one or more major life activities." 42 U.S.C. § 12102(1)(A).

Therefore, it is entirely possible that an employee may be considered "not fit for duty" while, at the same time, not be considered "disabled," especially for such a physically and psychologically demanding position as police officer. *See Boitnott v. Corning Inc.*, 669 F.3d 172, 175 (4th Cir. 2012) ("[T]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." (internal quotation marks omitted)). This disconnect between the FFDE findings and whether an employee is considered "disabled" under the Rehabilitation Act further underscores the need for Plaintiff to provide independent medical documentation of her disability.

Plaintiff also appears to shift the burden of gathering the necessary medical information onto Defendant, arguing, "Defendant, who had the ability to speak to either the FMRT Group *or* Boone's doctor, refused to speak to either." (ECF No. 40 at 17.) Plaintiff does not point to any authority that places the burden to gather information regarding the "nature, severity, and duration of the employee's impairment" on the defendant. (*See id.* at 16–17.) Instead, Plaintiff criticizes Defendant for "following the Second FMRT Report over Boone's doctor in disallowing Boone to return to work." (*Id.* at 17.) Plaintiff does not, however, reconcile the fact that she neither informed her healthcare provider, Nurse McCain, about her sexual assault nor sought treatment from a licensed mental health practitioner to address her trauma, as recommended by Nurse McCain and her second FMRT evaluator. (*See* ECF No. 34-1 at 50; ECF No. 34-5 at 18, 22–23; ECF No. 34-11 at 50.) Thus, at the time of her termination by UNC, more than nine months had passed from the date of her trauma without any treatment by a licensed psychologist. (ECF No. 34-1 at 44–45; ECF No. 40-11.)

In conclusion, the evidence, taken in the light most favorable to Plaintiff, fails to establish that Defendant was responsible for the breakdown in the interactive process when it requested Plaintiff to provide medical information that would allow it to determine whether an accommodation would allow Plaintiff to return to work. Rather, based on the evidence in the record, it was Plaintiff's failure to adequately address her trauma and provide the required documents to Defendant that lead to the breakdown in the interactive process. Accordingly, Plaintiff has failed to establish that Defendant "refused to provide" an accommodation, an essential element of her prima facie case. *See Wilson*, 717 F.3d at 346–47.

### b. *Reasonable Accommodation*

Although the interactive process broke down before the parties could ascertain whether a reasonable accommodation existed, Defendant argues that no reasonable accommodation would have allowed Plaintiff to perform the essential functions of her position. (ECF No. 34 at 21.) Plaintiff argues that she suggested two reasonable accommodations, leave or light duty, which would have allowed her to perform the essential functions of her position. (ECF No. 40 at 18.)

"[T]he interactive process is not an end in itself," and an employer who interfered in the interactive process "will not be held liable if the employee cannot identify a reasonable accommodation that would have been possible." *Wilson*, 717 F.3d at 347 (internal quotation marks omitted). The plaintiff bears the burden of identifying an accommodation that would allow her to perform the essential functions of her position, as well as "the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable." *Shin v. Univ. of Md. Med. Sys. Corp.*, 369 F. App'x 472, 481 (4th Cir. 2010). Indefinite leave is not

considered a "reasonable accommodation" under the ADA or Rehabilitation Act. *See Wilson*, 717 F.3d at 346 n.8 ("In leave cases, the accommodation must be for a finite period of leave." (emphasis omitted)); *Halpern v. Wake Forest Univ. Health Sci.*, 669 F.3d 454, 465 (4th Cir. 2012) ("[T]he Rehabilitation Act and ADA do not require an employer to give a disabled employee 'an indefinite period of time to correct [a] disabling condition' that renders him unqualified." (second alteration in original) (quoting *Myers v. Hose*, 50 F.3d 278, 280 (4th Cir. 1995))). Further, "permanent light duty" is not a reasonable accommodation, especially when it would require the employer to "reallocate job duties in order to change the essential functions of a job" or "hire an additional person to perform an essential function of a disabled employee's position." *Shin*, 369 F. App'x at 482; *see also Crabill*, 423 F. App'x at 323.

Plaintiff has failed to point to particular parts of the record that would indicate that any reasonable accommodation would have allowed her to perform the essential functions of her position. Plaintiff never identified a length of leave that would have allowed her to return to perform the essential functions of her position. When she was terminated on March 4, 2016, Plaintiff had already received eleven weeks of unpaid leave, in addition to her FMLA leave, which expired on December 18, 2015. (ECF No. 34-2 at 48; ECF No. 40-11.) Instead, she places the blame on Defendant, arguing that "a deeper involvement in the interactive process by Defendant would have likely resulted in a date certain for her return from light duty or leave." (ECF No. 40 at 18.) Other than Plaintiff's opinion that the parties would have found a date that she could return from leave, Plaintiff points to no other portion of the record that shows that any period of leave would have allowed her to return to her position as an active duty police officer. Although Plaintiff points to her work history since her termination, her

current position of working part-time at UPS does not provide any support to her contention

that she would have been able to return to her old position as a police officer at UNC at any

specific time.  (*See* ECF No. 40-2 at 7–10.)  Therefore, Plaintiff has failed to point to sufficient

evidence showing that any period of leave would have been a reasonable accommodation.

Further, light duty would not have been a reasonable accommodation for Plaintiff.

Much like her suggestion for leave, Plaintiff did not provide a prospective end date for her

light duty.  (*See* ECF No. 40-5 at 13–14.)  Nor would assigning Plaintiff to permanent light

duty serve as a reasonable accommodation, because it would have forced Defendant to hire

another worker to fulfill Plaintiff's essential duties.  (*See* ECF No. 34-8 at 7–8.)  Specifically,

Chief McCracken stated:

> Q. Is it a particular hardship to the department to have an officer
> on light duty?
>
> A. So it is a strain on the staff, certainly.  So if an officer is taken
> out of the lineup, so to speak, to work light duty, there could be
> times when we would have to have an officer work on their day
> off to cover what they would ordinarily be doing on a regular
> shift.
>
> Q. Is it a manageable variety of strain?
>
> A. So, you know, I guess that's a relative term.  That depends on
> the length of time, what other impact that individual's particular
> working that might already be undergoing, it could certainly vary.

(*Id.*)  In light of Chief McCracken's testimony that having Plaintiff on permanent light duty

would be a "strain on the staff," Defendant is not required to offer permanent light duty as a

reasonable accommodation.  *See Shin*, 369 F. App'x at 482.  Therefore, Plaintiff has failed to

show that she proposed a reasonable accommodation that would have allowed her to perform

the essential functions of her position, and thus she has failed to establish another element of her prima facie case of disability discrimination. *See Wilson,* 717 F.3d at 345.

Plaintiff has therefore failed to establish two essential elements of her prima facie case of failure to accommodate under the Rehabilitation Act. Accordingly, there is no genuine dispute of material fact with respect to her claim, and Defendant is entitled to judgment as a matter of law.

### C. FMLA Retaliation

Defendant also argues that it is entitled to summary judgment on Plaintiff's claim for FMLA retaliation. (ECF No. 34 at 23–26.) FMLA retaliation claims are similar to those under Title VII and are analyzed under the *McDonnell Douglas* burden-shifting framework. *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 550–51 (4th Cir. 2006). To establish her retaliation claim, Plaintiff must first demonstrate a prima facie case showing that "[s]he engaged in protected activity, that the employer took adverse action against [her], and that the adverse action was causally connected to the plaintiff's protected activity." *Id.* at 551 (quoting *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998)). If Plaintiff succeeds in showing a prima facie case and Defendant "offers a non-discriminatory explanation" for the adverse action, then Plaintiff "bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation." *Id.* (quoting *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001)).

Defendant argues that Plaintiff cannot show any causal connection between her protected activity of taking FMLA leave and the adverse action taken, when Plaintiff was terminated. (ECF No. 34 at 23–26.) Plaintiff argues in response that she satisfies the causation

element of the prima facie case by temporal proximity between her protected activity and the adverse action taken against her. (ECF No. 40 at 19–20.)

While close temporal proximity "far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality." *Mercer v. Arc of Prince Georges Cty, Inc.*, 532 F. App'x 392, 398 (4th Cir. 2013) (quoting *Yashenko*, 446 F.3d at 551); *see also Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (discussing that close temporal proximity may be "strongly suggestive of retaliatory motive and thus indirect proof of causation"). Although neither the Supreme Court nor the Fourth Circuit has "adopted a bright temporal line," courts have held that an adverse action taken ten weeks after a protected activity is not close enough in time to support a finding of causation, absent additional evidence of retaliation. *Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012); *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (citing cases holding that a three-month period is insufficient to show causation); *but see King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (holding that a two-month and two-week period would typically "weaken significantly the inference of causation," but did not in that case given the "particular employment situation"). If the protected activity and the adverse employment action are not sufficiently close in time, then a plaintiff must introduce "additional evidence of retaliation" to demonstrate causation. *Perry*, 489 F. App'x at 643.

In her brief opposing Defendant's motion for summary judgment, Plaintiff, for the first time, appears to argue that her second FFDE, which occurred on January 8, 2016, (ECF No. 34-11 at 48), was the "adverse action" that this Court should consider in evaluating her FMLA retaliation claim. (ECF No. 40 at 20.) However, in Plaintiff's complaint and in her

deposition, Plaintiff had argued that her termination, which occurred on March 4, 2016, was the "adverse action." (ECF No. 1 ¶ 60; ECF No. 42-1 at 2.)

Assuming Plaintiff's second FFDE were considered the "adverse action," then the temporal proximity between the expiration of her FMLA leave on December 18, 2015, and the FFDE on January 8, 2016, would certainly be sufficient for Plaintiff's prima facie case. *See Mercer*, 532 F. App'x at 394, 398. If, on the other hand, Plaintiff's termination is considered the "adverse action," then the approximately eleven weeks between the expiration of her FMLA leave and her termination would be insufficient, without additional evidence, to satisfy Plaintiff's prima facie case. *See Perry*, 489 F. App'x at 643; (ECF No. 34-2 at 48; ECF No. 40-11).

Nevertheless, regardless of whether the "adverse action" is the second FFDE[6] or Plaintiff's termination, Plaintiff must also show that Defendant's proffered nondiscriminatory reason for its actions is pretext for FMLA retaliation. *See Yashenko*, 446 F.3d at 551. The plaintiff bears the "ultimate burden of persuading the court that [she] has been the victim of intentional [retaliation]." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (alterations in original) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)).

---

[6] This is also assuming, without deciding, that the second FFDE could be considered an "adverse action." For retaliation claims, an "adverse action" is one that "would have been materially adverse to a reasonable employee." *Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 431 (4th Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)); *see also Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004) ("Adverse employment actions include any retaliatory act . . . if that act . . . results in an adverse effect on the terms, conditions, or benefits of employment.").

For purposes of the FFDE, Plaintiff cannot show that Defendant required Plaintiff to submit to a FFDE for any retaliatory purpose. Under the ADA, employers are permitted to ask employees to provide certification that they are medically fit for duty. *See Porter v. U.S. Alumoweld Co.*, 125 F.3d 243, 246 (4th Cir. 1997) (interpreting 42 U.S.C. § 12112(d)(4)). Defendant's stated reason for requiring that Plaintiff undergo a second FFDE was because "FMRT had previously found her to be psychologically unfit for duty." (ECF No. 34-7 ¶ 27.) Plaintiff points to no other evidence in the record that would indicate that Defendant's request that Plaintiff complete a second FFDE was in retaliation to Plaintiff's exercise of her FMLA leave.

Further, Defendant's stated reason for ultimately terminating Plaintiff was "[h]er unavailability" and not because she exercised FMLA leave. (ECF No. 40-4 at 7–8.) Before Plaintiff was terminated, she was given one month of paid leave and approximately eleven weeks of unpaid leave, in addition to her required amount of FMLA leave. (*See* ECF No. 34-2 at 41, 48; ECF No. 40-11.) In that time, as stated above, Plaintiff did not submit the requested medical information to allow the parties to determine whether a reasonable accommodation existed that would allow her to return to her position. (*See* ECF No. 40-11 at 2.)

Plaintiff's arguments for her FMLA retaliation claim essentially re-hash her arguments for discrimination under the Rehabilitation Act, arguing that Defendant's "manufactured reason for termination indicates an ulterior motive and shows that Defendant intended to terminate Plaintiff rather than allowing her to return from her FMLA leave." (ECF No. 40 at 22.) Plaintiff does not otherwise point to any evidence for a reasonable juror to find that

Defendant's non-retaliatory reasons for terminating Plaintiff or requiring her to complete a second FFDE were pretext for retaliation. (*See id.*)  At the summary judgment stage, Plaintiff "cannot rely upon 'mere speculation or the building of one inference upon another' to establish that [s]he was fired in retaliation for taking FMLA leave."  *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016) (quoting *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008)).  Because Plaintiff provides nothing but "mere speculation" regarding Defendant's retaliatory intent, Defendant is entitled to summary judgment regarding Plaintiff's FMLA retaliation claim.

## IV.    CONCLUSION

Plaintiff's motion to seal will be granted.  Further, the Court finds that although Plaintiff's Rehabilitation Act claim is not barred by the statute of limitations, Defendant is entitled to summary judgment on that claim.  Defendant is also entitled to summary judgment on Plaintiff's FMLA retaliation claim.


**[ORDER TO FOLLOW ON NEXT PAGE]**

For the reasons outlined herein, the Court enters the following:

**ORDER**

IT IS THEREFORE ORDERED that Defendant's Motion to Seal, (ECF No. 35), is GRANTED. The documents initially filed under seal, (ECF Nos. 37-1 to 37-4), shall be permanently sealed.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment, (ECF No. 33), is GRANTED, and Plaintiff's remaining claims against Defendant are hereby DISMISSED WITH PREJUDICE.

A Judgment dismissing this action will be entered contemporaneously with this Order.

This, the 17th day of June 2019.

/s/ Loretta C. Biggs
United States District Judge